694 A.2d 860 (1997)
In re D.A.J.; District of Columbia, Appellant.
No. 96-FS-1069.
District of Columbia Court of Appeals.
Argued March 27, 1997.
Decided May 1, 1997.
*861 Sidney R. Bixler, Assistant Corporation Counsel, with whom Jo Ann Robinson, Acting Corporation Counsel, Robert R. Rigsby, Deputy Corporation Counsel, Enforcement Division, and Rosalyn Calbert Groce, Director, Policy and Appeals Branch, were on the brief, for appellant.
James Forman, Jr., Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellee.
Before FARRELL and REID, Judges, and KERN, Senior Judge.
REID, Associate Judge.
The District of Columbia appeals the grant of a motion to suppress tangible evidence, including a gun and ammunition, found near appellee D.A.J. at the time of his arrest, and to suppress a statement D.A.J. allegedly made during his arrest. D.A.J. was arrested and charged by a delinquency petition with one count of assault on a police officer, in violation of D.C.Code § 22-505(b) (1996); one count of carrying a pistol without a license, in violation of D.C.Code § 22-3204 (1996); one count of possession of an unregistered firearm, in violation of D.C.Code § 6-2311(a) (1995); and one count of possession of unregistered ammunition, in violation of D.C.Code § 6-2361 (1995). We affirm.

FACTUAL SUMMARY
Two officers of the Metropolitan Police Department, Anthony Moye and Thomas Jefferson, were on patrol duty in the 2200 block of Alabama Avenue, S.E., on June 25, 1995, at approximately 3:50 p.m. Officer Jefferson saw a blue vehicle with "homemade tags" and a broken vent window. He suspected that the automobile, which had four young male occupants, had been stolen. The officers activated *862 their emergency lights and horn to stop the car. The vehicle pulled into the parking lot of a Jerry's Carryout, and the officers stopped about five feet behind it. As the officers got out of their car to investigate, one of the passengers in the stopped vehicle, later identified as D.A.J., began to exit the vehicle. Officer Moye, who at the time had been on the police force for approximately one year, ordered all of the passengers to stay still. While three of the occupants "put their hands up in the air," D.A.J. continued to get out of the car and ignored orders to get back into the vehicle. The officers approached the stopped car without drawing their weapons.
Officer Moye, who testified at the hearing on D.A.J.'s motion to suppress, stated that he "noticed a gun in [D.A.J.'s] left hand" and that "[i]t looked like a black revolver." D.A.J. "was holding [the gun] in his left hand close to his body, sort of cradled." He told D.A.J. twice to drop the gun, but D.A.J. began to run. Officer Moye pursued him. According to him, D.A.J. "turned toward [him], pointing the gun back at [him]" with his left hand. The trial court described Officer Moye's demonstration of D.A.J.'s position and action:
Let the record reflect that the witness  standing, facing counsel, extended his left arm straight out from the shoulder and turned his body and arm counter-clockwise; that is, right to left, and pointed the gun in the direction just off his rear left shoulder.
Officer Moye shot D.A.J. twice. One of the shots hit D.A.J. in the hip and Officer Moye saw D.A.J. "[drop] his weapon and [begin] to run." D.A.J. "put up a struggle, a fight" as Officer Moye sought to apprehend him. In the course of the struggle, D.A.J. allegedly made an incriminating statement to the officer. When counsel for the District asked why he fired his weapon, Officer Moye responded, "I felt that my life was threatened. I feared for my life."
Two lay persons testified for the defense. D.A.J.'s mother, P.J., said she is left-handed but that D.J. is right-handed. Xiao Chen, a college student who worked at Jerry's Carryout at the time of the incident, testified as a defense witness. She did not know D.A.J. While she was working behind the counter at Jerry's on June 25, 1995, she looked out through the glass door and three glass windows. She "saw a boy's car pull up in front of the store ... and the police car pull behind him." A boy (D.A.J.) got out of the car and ran. D.A.J.'s hands were pumping up and down as he ran. He did not have a gun in either hand, but the officer had a gun in his hand while running. She saw the officer fire his gun, and heard a couple of shots; however, she did not see D.A.J. when the bullet struck him. D.A.J. did not point a gun or his arm at the officer, and "had his back to the officer" when the officer fired his gun.
Dr. John Smialek, Chief Medical Examiner for the State of Maryland and a forensic pathologist, also testified as a defense witness. He specializes in determining how injuries occur.[1] Dr. Smialek reviewed D.A.J.'s medical records, photographs and part of a hearing transcript before forming an opinion. He "found evidence that Mr. J. had sustained a gunshot wound to the back of his left hip, that the wound had traveled approximately two to three inches through the tissue of his left hip." In response to a question from the trial court concerning whether "there [is] a way to determine from the path of the bullet whether or not in fact the body was in transit at the time it was struck," Dr. Smialek stated,
[t]he bullet is striking with such velocity that it's going to create a wound suspended in time as to what the position of that body was to the person shooting the weapon. So, if you take a sequence of events, a person being shot, say, directly in the back, that would create a wound track going directly from front to back. If the person is rotating, then you are going to get an angle.
When the trial court asked whether he was "able to say, with a degree of certainty . . . that at the time the bullet struck . . . [t]he path of the bullet is such that the direction *863 had to be . . . [b]ack to front, rather than some degree of side," Dr. Smialek replied, "[y]es, sir. It was directly back to front." The trial court asked whether counsel had "any questions based on the Court's questions." Counsel for the District responded in the negative, as did D.A.J.'s counsel.
The trial judge described D.A.J.'s case as "unusual" because "[t]he court is rarely in a position that it has such startling varying description of the same identical set of circumstances by people equally able to speak on the issues." The trial court had to resolve conflicting testimony as to whether D.A.J. had a gun, and whether his back was facing Officer Moye when the officer shot him. Because he could not discredit the testimony of Ms. Chen, D.A.J.'s mother or Dr. Smialek, the trial judge concluded that he could not credit Officer Moye's testimony, "[n]ot necessarily because it was untrue, but simply because it is inconsistent with all the evidence available to the Court." Hence, the trial judge concluded that at the time he fired the shots at D.A.J., Officer Moye "could not have been in eminent [sic; imminent] fear for his own life, because in fact he was facing the back of the respondent. And therefore, ... his seizure was not lawful under those circumstances, because it was not consistent with the circumstances he faced." The trial court also said, "[i]f [D.A.J.] had a gun in his hand at that time, it could not have been pointed at the officer." Accordingly, because "the bullet passing through [D.A.J.'s] body did constitute a seizure" that was not lawful, the trial court granted D.A.J.'s motion to suppress.
The government filed a motion for reconsideration in which it argued that the trial court should have discredited the testimony of Ms. Chen; that the testimony of Officer Moye and that of Dr. Smialek were consistent; and that the testimony of P.J. was inconsequential because D.A.J. could have used his left hand even though he is right-handed. The trial court denied the motion, stating in part that "[t]he Government has alleged no legal error in the court's ruling, and only argues that the Court improperly weighed the testimony of witnesses."[2]

ANALYSIS
The District contends that even if Officer Moye used excessive force, he had probable cause to arrest or at least seize and frisk D.A.J., and the gun therefore should not have been suppressed. It argues that where the police have a legitimate basis for stopping and searching an individual, the exclusionary rule does not require suppression of evidence merely because the force used in effecting the seizure was excessive. The remedy in such a case, the government says, should be a civil suit or equivalent relief, but not the suppression of probative and reliable evidence.
This is a complex and problematical issue involving the scope of the exclusionary rule and the Fourth Amendment which has never been addressed by this court. Significantly, however, the District did not raise this issue in the trial court, either during the hearing on D.A.J.'s motion to suppress or in its motion for reconsideration.[3] Because the District did not raise the issue, the trial court did not decide whether Officer Moye had probable cause to arrest D.A.J. or even a reasonable basis to stop and frisk him  a necessary predicate finding, the District concedes, for its exclusionary rule argument. Rather, the trial court concluded only that the seizure of D.A.J. entailed the use of excessive force and therefore was unreasonable under "the totality of the evidence before the Court." Accordingly, the court never addressed the issue of the scope of the *864 exclusionary rule issue which the government raises in this court for the first time.
As a secondary argument, the District also maintains that the officer reasonably feared for his life even if D.A.J. was not aiming the gun at him when he was shot by the officer, because the officer might have seen him brandishing it earlier. But this argument too was not raised in the trial court, and so the trial judge was never called upon to find whether D.A.J. had held a gun in his hand at an earlier point in time. Indeed, in ruling on the motion, the judge expressly stated that he could not say, "based upon my understanding of the evidence before me, whether or not at some point . . . [D.A.J.] pulled, brandished that weapon" (emphasis added). The exclusive focus of the evidentiary presentation and the parties' arguments was on whether D.A.J. was pointing a gun at the officer when he was shot. The trial court found that he was not.
We have consistently declined to rule on issues never addressed by the trial court. See Little v. United States, 665 A.2d 977, 980 (D.C.1995). Rather, we have repeatedly invoked the principle set forth in Miller v. Avirom, 127 U.S.App.D.C. 367, 369-70, 384 F.2d 319, 321-22 (1967):
In our jurisprudential system, trial and appellate processes are synchronized in contemplation that review will normally be confined to matters appropriately submitted for determination in the court of first resort. Questions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal.
(Footnotes omitted.) Accordingly, as we said in Little, supra, "[w]e are constrained to avoid decision on an issue which has never been aired before the trial court." 665 A.2d at 980.
Ordinarily, this court may decline to consider even constitutional arguments made by a criminal defendant that have not been raised in the trial court. E.g., Garris v. United States, 465 A.2d 817, 822 (D.C.1983). The rule ought to apply equally to claims of erroneous suppression made by the government. This is especially so when, as indicated, the failure to raise the issue deprived the trial court of the opportunity to make subsidiary findings necessary to resolution of the legal issue. Here, besides the fact that the trial court made no finding (not having been asked to) whether the police had a lawful basis to arrest and search D.A.J. using proper force, yet another issue the trial court was not called upon to decide would be pertinent to the District's argument against application of the exclusionary rule. The District appears to argue that exclusion of evidence might be appropriate where excessive force is of a magnitude that "shocks the conscience" or "offends a sense of justice" (citing Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)). In a similar vein, the Supreme Court has pointed out that, the exclusionary rule aside, "[f]ederal courts may use their supervisory power in some circumstances to exclude evidence taken from the defendant by `willful disobedience of law.'" United States v. Payner, 447 U.S. 727, 735 n. 7, 100 S.Ct. 2439, 2446 n. 7, 65 L.Ed.2d 468 (1980) (citations omitted). While the government argues that the shooting here cannot reasonably be said to have risen to that level of police fault, we would be loath to consider making that determination without findings by the trial court addressed specifically to it, and not made here. In sum, judicial economy counsels strongly against giving the government a second chance to raise issues  particularly a policy one so novel and complex as its argument for inapplication of the exclusionary rule  which it had full opportunity to present the first time around.
We therefore turn to the District's remaining argument, which is that the trial court committed clear error in concluding that Officer Moye shot D.A.J. in the back, and could not have feared for his life. In short, the District of Columbia attacks the factual findings of the trial court. In reviewing the denial or grant of a motion to suppress, "the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial ruling." Peay v. United States, 597 A.2d 1318, 1320 (D.C.1991) (en *865 banc) (citation omitted). Moreover, "[w]e must accept the trial judge's findings of evidentiary fact and his resolution of conflicting testimony." Brown v. United States, 590 A.2d 1008, 1020 (D.C.1991) (citing Lawrence v. United States, 566 A.2d 57, 60 (D.C.1989)). We reverse factual findings only if they are clearly erroneous. Lewis v. United States, 632 A.2d 383, 385 (D.C.1993).
The trial court is in the best position "to observe and assess the demeanor of the witnesses." In re S.G., 581 A.2d 771, 774 (D.C.1990). This court "will not redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion." Id. at 775 (citation omitted). Furthermore, the testimony of two key witnesses in this case, Dr. Smialek and Ms. Chen, involved demonstrations which the trial court carefully observed, but which cannot be recreated in this court. Therefore, based on the record before us, we conclude that the trial court's factual findings are not clearly erroneous, and there is no error in its legal conclusions.
For the foregoing reasons, we affirm the judgment of the trial court.
Affirmed.
NOTES
[1] Although Dr. Smialek's work generally focuses on dead bodies, he stated that the identification of patterns of injury is the same for living persons.
[2] The government did not appeal the denial of its motion for reconsideration.
[3] In his original motion to suppress, D.A.J. sought to suppress evidence solely on the ground that "the police lacked a warrant, probable cause, or reasonable articulable suspicion." However, in his supplement to the motion to suppress, D.A.J. also maintained that the gun and statement "must be suppressed because the police acted unreasonably for Fourth Amendment purposes when they seized [D.A.J.] by shooting him in the back of the hip." The District filed no opposition to D.A.J.'s supplement, and failed to argue during the hearing on the motion to suppress that the gun and statement could be admitted into evidence, despite the use of excessive force, because Officer Moye had probable cause to arrest D.A.J.