**James P. GILLIAM, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 08–CF–475, 08–CF–504, 08–CF–505.

District of Columbia Court of Appeals.

Argued Dec. 14, 2009.
Decided June 21, 2012.

Howard Margulies for appellant.

Emily C. Scruggs, Assistant United States Attorney, with whom Channing D. Phillips, Acting United States Attorney at the time the brief was filed, Roy McLeese III, Mary B. McCord, and Matthew M. Graves, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN, Associate Judge,* RUIZ, Associate Judge, Retired,** and SCHWELB, Senior Judge.

RUIZ, Associate Judge, Retired:

James P. Gilliam appeals his convictions for possessing weapons and drugs and failing to obey a court order to appear in court. Appellant claims that the trial court erred (1) in denying his motion to suppress evidence because there was no credible evidence to support probable cause, (2) in failing to correct the prosecutor's mischaracterization of the reasonable doubt standard, and (3) in convicting him of violating the Bail Reform Act when there was insufficient evidence to support the conviction. For the reasons that follow, we affirm the judgment of the trial court.

## I. Facts

On October 13, 2005, at approximately 6:35 p.m., Metropolitan Police Department (MPD) Officer Richard Peake and several other officers executed a search warrant for narcotics at 3417 25th Street, S.E., in Washington, D.C. Officer Peake testified at the suppression hearing that he had been employed by MPD for about five years and was working as a member of the Seventh District's "power-shift team," where he concentrated on "high-drug areas [and conducted] traffic stops . . . to get lock-ups." Since October 2005, Officer Peake had participated in over 100 drug-related arrests. Officer Peake testified that when he arrived at the 3417 25th Street address, another officer told him to approach the ice-cream truck that was parked in the driveway of the house that was the target of the search warrant, because police "had been getting numerous complaints about people selling narcotics out of the vehicle." Officer Peake observed an extension cord running from the front of the truck to the back of the house. As Officer Peake approached the ice-cream truck, he saw "several occupants inside," "smelled the strong odor of marijuana coming from the ice cream truck," and saw "smoke coming out of [it]." Based on the strong smell emanating from the ice-cream truck, Officer Peake decided to enter the truck.

Inside the ice-cream truck, the officer found appellant and two women, Kelly Jones and Audrey Green. Officer Peake seized a cigar box containing 93 grams of marijuana, a plastic container holding 252 grams of marijuana, a cash-box containing nine zip-lock bags of marijuana, loose crack cocaine, two digital scales, and additional empty zip-lock bags. He did not see any remnants of marijuana smoking, such as burnt blunts, burnt marijuana cigarettes, or ash. Officer Peake testified, however, that he continued to smell burnt marijuana "when [he] was inside the truck."

Appellant was arrested inside the ice-cream truck. According to Officer Peake, when appellant was taken from the truck, "He was very belligerent. He was very upset [and] uncooperative[,]" telling the police "you ain't got no right, this is my truck, my house, my yard, I need to see a warrant."

Several other police officers searched the house, where they found a loaded 9–millimeter handgun, a loaded .22–caliber handgun, an unloaded 9–millimeter handgun, .45–caliber ammunition, a digital scale box, two shoeboxes containing marijuana

---

* Judge Glickman has replaced Judge Kramer, who retired on May 1, 2011.

** Judge Ruiz was an Associate Judge of the court at the time the case was argued. Her status changed to Associate Judge, Retired, on September 1, 2011.

residue, a plastic bag containing small glass vials, and numerous empty zip-lock bags. Appellant's personal papers, checks in appellant's name, birth certificate, and social security card were also found in the house and seized.

On December 20, 2005, MPD officers executed another search warrant at the 3417 25th Street address. Appellant and Kelly Jones were in the living room smoking marijuana when the police arrived. This time the police found crack cocaine in the living room closet, and marijuana and one round of .45–caliber ammunition where appellant and Jones were sitting. In the bedroom, police found a loaded .45–caliber handgun; four scales, zip-lock bags, and a razor blade on the table beside the bed; $457.50 in currency and a money counter; 27 rounds of .22–caliber and .45–caliber ammunition in the bedroom closet; and additional personal checks with appellant's name. A search of appellant yielded two clear zip-lock bags of marijuana and $142.

Appellant was ordered to appear in court for trial on May 25, 2006. The trial was continued to May 31, and appellant received another order to return to court. Appellant was in court on the morning of May 31, but his case was passed over. When the case was recalled, appellant was not in the courtroom.

Three cases were brought against appellant, two were based on the drugs and weapons found during the searches on October 13 and December 20, and one on appellant's failure to appear in court. The three cases were consolidated for trial. With respect to evidence seized during the October 13 search of the house, appellant was found guilty of two counts of unlawful possession with intent to distribute a controlled substance (marijuana and cocaine), D.C.Code § 48–904.01(a)(1) (2001), three counts of unlawful possession of ammunition, D.C.Code § 7–2506.01(3) (2001), and two counts of possession of an unregistered firearm, D.C.Code § 7–2502.01 (2001). Evidence seized from the search of the ice-cream truck led to conviction of two counts of unlawful possession with intent to distribute a controlled substance (marijuana and cocaine). These convictions are the subject of Appeal No. 08–CF–504 (05–FEL–5911). Based on the second search of the house, on December 20, appellant was acquitted of one count of unlawful possession with intent to distribute a controlled substance while armed, D.C.Code § 48–904.01(a)(1), but convicted of two counts of unlawful possession of a controlled substance (marijuana and cocaine), D.C.Code § 48–904.01(d), one count of possession of a firearm during a crime of violence or dangerous offense, D.C.Code § 22–4504(b) (2001), two counts of unlawful possession of ammunition, D.C.Code § 7–2506.01(3), two counts of possession of an unregistered firearm, D.C.Code § 7–2502.01, one count of unlawful possession of drug paraphernalia, D.C.Code § 48–1103(a) (2001), and one count of keeping a bawdy or disorderly house, D.C.Code §§ 22–2722, –2713, –2717 (2001). These convictions are the subject of Appeal No. 08–CF–505 (05–FEL–7333). The Bail Reform Act (BRA), D.C.Code § 23–1327(a) (2001), conviction is the subject of Appeal No. 08–CF–475 (07–CF2–12586). We consolidated the three appeals for our review.

## II. Probable Cause

Appellant claims that the trial court erred in denying his motion to suppress the tangible evidence found in the truck, because the search warrant was limited to the house and Officer Peake lacked probable cause to search the ice-cream truck.[1] The government argues that the officer,

---

1. Appellant does not challenge the searches, pursuant to warrant, of the house.

who testified to having smelled burnt marijuana and observed smoke emanating from the ice-cream truck, had probable cause to search the truck under the "plain smell" doctrine.[2]

■ A suppression motion presents a mixed question of law and fact; we review the findings of fact for clear error and conclusions of law—whether the facts establish probable cause—*de novo. See Holt v. United States,* 675 A.2d 474, 478 (D.C. 1996). In reviewing the denial of a suppression motion, we "view the evidence presented at the suppression hearing in the light most favorable to the party prevailing below, and we draw all reasonable inferences in that party's favor." *Womack v. United States,* 673 A.2d 603, 607 (D.C. 1996) (citing *Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991) (en banc)).

■ "This court has repeatedly found probable cause to search an automobile based, at least in part, on an officer's recognition of the smell of drugs." *Minnick v. United States,* 607 A.2d 519, 525 (D.C.1992) (citing *United States v. Bolden,* 429 A.2d 185 (D.C.App.1981)). Appellant takes no issue with this principle. He contends, however, that the trial court erred in crediting Officer Peake's testimony that he smelled burning marijuana and saw smoke coming out of the truck because it was "plainly contradicted" by the physical evidence, as Officer Peake himself acknowledged that no burnt blunts, burnt marijuana cigarettes, or ash were found inside the ice-cream truck. The presence of physical evidence of burnt marijuana in the truck was critical to corroborate the officer's testimony, says appellant, and

"[i]ts absence impugned the officer's credibility." Although we agree with appellant that without Officer Peake's testimony that he smelled marijuana and saw smoke coming from the ice cream truck, the trial court's conclusion that the officers had probable cause to search the truck cannot be upheld, we disagree that the trial court clearly erred in crediting the officer's testimony.

Officer Peake testified that he had been a police officer for five years and had participated in over 100 drug-related arrests. The trial judge commented, in crediting Officer Peake's testimony, "I understand the point that there was no ash found and so forth, but he seems credible, and there's nothing that has been submitted, really, that I can see that would contradict that." We " 'will not redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion.' " *In re D.A.J.,* 694 A.2d 860, 865 (D.C.1997) (quoting *In re S.G.,* 581 A.2d 771, 775 (D.C.1990)). The trial judge could have disbelieved Officer Peake because his account was not corroborated by evidence of burnt marijuana in the truck. But the trial judge was not required to discredit the officer's testimony. We can agree with appellant that one would normally expect that Officer Peake would have found evidence of the burnt marijuana he had smelled outside and inside the truck when he searched the truck. That discrepancy does not necessarily, as appellant contends, "plainly contradict" the officer's testimony such that it was incapable of belief, nor was it "inherently incredible" as a

---

**2.** The trial court did not rely on the information Officer Peake was given about "numerous complaints" of drug sales from the truck, and the government does not urge that as a basis for probable cause. There was no identification of the source of the complaints, or

when they had been received. Although concern for the officers' safety also was mentioned at the hearing, the government does not argue that concern justified a search of the truck.

matter of law. *See Graham v. United States,* 12 A.3d 1159, 1164 (D.C.2011) ("Inherent incredibility ... is only invoked where 'testimony can be disprove[d] ... as a matter of logic by the uncontradicted facts or by scientific evidence or when the person whose testimony is under scrutiny made allegations which seem highly questionable in the light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave.' ") (alterations in original) (quoting *In re A.H.B.,* 491 A.2d 490, 496 n. 8 (D.C.1985)). The trial court observed Officer Peake on the stand and believed he "seem[ed] credible." A witness can be credible, yet fallible. The trial court could consider that Officer Peake reasonably identified the smell ("like a skunk") as burnt marijuana and saw smoke emanating from the truck, but was either honestly mistaken or simply overlooked (or appellant and his companions quickly discarded) the evidence of smoked material inside the truck. Thus, we cannot say that the trial court's finding that Officer Peake went into the truck after he thought he smelled burnt marijuana was " 'clearly erroneous or not supported by the record,' " *Mitchell v. United States,* 985 A.2d 1125, 1132 (D.C.2009) (quoting *Crawford v. United States,* 932 A.2d 1147, 1153 (D.C.2007)), where police officers found a significant quantity of marijuana in the ice-cream truck. *Cf. United States v. Foster,* 376 F.3d 577, 583–84 (6th Cir. 2004) (whether police smelled burnt or fresh marijuana was irrelevant to finding probable cause where one officer smelled burnt marijuana but the other officer smelled fresh marijuana, and marijuana was ultimately recovered from the car).

■ Appellant also claims that the trial court improperly shifted the burden of proof to the defense when he stated "there's nothing that has been submitted, really, that I can see that would contradict" the officer. According to appellant, although the trial court noted the absence of physical evidence to support Officer Peake's testimony—"no ash found and so forth"—it questioned the lack of *further* contradictory evidence.

■ The government bears the burden of establishing probable cause to conduct a warrantless search. *See In re B.K.C.,* 413 A.2d 894, 902 (D.C.1980) ("The burden is upon the party who seeks to establish the constitutionality of a warrantless search to prove that the search falls within one of the recognized exceptions.") (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). However, merely considering whether the government's evidence has been contradicted does not, without more, shift the burden of proof to the defendant. It is the role of the fact-finder, in determining a witness's credibility, to consider whether other evidence corroborates or contradicts the witness, especially if he is the only witness taking the stand. We have repeatedly held that it is permissible for a fact-finder to do what the trial court did in this instance: to consider whether the defense contradicted the government's evidence. *See, e.g., Reed v. United States,* 828 A.2d 159, 164 (D.C.2003) (prosecutor's comments in closing argument that the defense failed to contradict the government's evidence did not suggest that the defense had the burden of proof); *Harris v. United States,* 602 A.2d 154, 165 (D.C. 1992) (en banc) (government may argue weaknesses in the defense case, including lack of corroboration, without shifting the burden of proof). If a fact-finder may do so in making the ultimate determination of whether the government has proven guilt beyond a reasonable doubt, a trial court also may consider the absence of contra-

dictory evidence in making the lesser determination of probable cause. We conclude that the court committed no legal error in denying the motion to suppress based on Officer Peake's testimony.

### III. Prosecutorial Argument on Reasonable Doubt

Appellant argues that the prosecutor, in rebuttal argument, improperly commented on the reasonable doubt standard, offering misleading comparisons to specific decisions jurors might make in their personal lives that lessened the demanding standard of proof "beyond a reasonable doubt" required for criminal conviction and effectively lowered the government's burden of proof. Appellant contends that the trial court abused discretion because, instead of giving an immediate corrective instruction, the court deferred instructing the jury on reasonable doubt, and responded to appellant's objection in a way that confused the jury. The government responds that neither the prosecutor's comments nor the lack of an immediate instruction was improper or prejudicial.

■■■ In considering claims of misstatements or improper argument, "it is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel." *Irick v. United States,* 565 A.2d 26, 33 (D.C.1989). In doing so, "we must first determine whether the prosecutor's challenged comments were improper." *Najafi v. United States,* 886 A.2d 103, 107 (D.C.2005) (citing *Irick,* 565 A.2d at 32). If we determine that the comments were improper, we must view them "in context, [ ]consider[ing] the gravity of the misconduct, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case." *Irick,* 565 A.2d at 32 (citing *Hammill v. United States,* 498 A.2d 551, 554 (D.C.1985)). Where, as

here, defense counsel objected at trial, "we will reverse only if it is shown that substantial prejudice resulted," *Porter v. United States,* 826 A.2d 398, 406 (D.C. 2003), and "we must affirm if the error was harmless." *Najafi,* 886 A.2d at 107. "As to harmlessness, our inquiry is whether we can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error....'" *Id.* at 107–08 (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

### A. *The Prosecutor's Rebuttal and the Trial Court's Instructions*

The prosecutor began rebuttal argument by explaining the reasonable doubt standard:

[Reasonable doubt] is a term that we throw around that has come to mean or has come to have been used in some arguments as meaning you can't have any question left in your mind, whatsoever. And that's simply not reasonable doubt. You're going to hear the instruction about what reasonable doubt is. And reasonable doubt is the kind of doubt that would cause a reasonable person[ ], after careful and thoughtful reflection, to hesitate to act in the graver or more important matters of life. However, it is not an imaginary doubt, nor a doubt based on speculation or guesswork; it is a doubt based on reason.

The government is not required to prove guilt beyond all doubt, or to a mathematical or scientific certainty. Its burden is to prove guilt beyond a reasonable doubt. So it is not reasonable doubt to be able to say I have one more question: Therefore, reasonable doubt, not guilty.

Reasonable doubt is the kind of doubt you would have about any serious decision that you face in your life. And this is a serious decision which you're now facing. Think about what level of certainty you need when you do anything like getting a job, getting married, moving, any of those things. You're always still going to have questions. There's one more question you could ask, one more person you could talk to before you get a job. There's certainly one more question you could ask before you get married, or get in a committed relationship with a partner. I bet those of you that are married or in committed relationships are still learning new things, still learning questions that you might have asked. But that's not reasonable doubt.

Appellant's counsel objected to the prosecutor's comments about the meaning of reasonable doubt. The trial court responded, in open court, "No, that's argument. The jury will have the instruction and will make up its mind."

In its final instructions to the jury, the trial court read the standard instruction on reasonable doubt established by this court in *Smith v. United States*, 709 A.2d 78, 82 (D.C.1998).[3] The court told the jury that "[t]he statements and arguments of the lawyers are not evidence. They are only intended to assist you in understanding the evidence." The court also told the jury, "It is your duty to accept the law as I state it to you. You should consider all the instructions as a whole; you may not ignore any instruction or question the wisdom of any rule of law."

### B. *Prejudice*

Appellant contends that the prosecutor's rebuttal argument about reasonable doubt was improper and that he was prejudiced by the manner in which the trial judge resolved defense counsel's objection, by saying in open court that the prosecutor's statements were "argument" and that "[t]he jury will have the instruction and will make up its mind." Appellant argues that the court's reference to the prosecutor's comments on the meaning of reasonable doubt as "argument" was inadequate and that the court "never explained to the jury how it was to *make up its mind* between the instructions" and the prosecutor's rebuttal argument. As a result, he claims jurors were misled, or at a minimum confused, about the nature and gravity of the decision they faced, and the high level of certainty each juror needed to

---

**3.** The approved reasonable doubt instruction states,

> The government has the burden of proving the defendant guilty beyond a reasonable doubt. In civil cases, it is only necessary to prove that a fact is more likely true than not, or, in some cases, that its truth is highly probable. In criminal cases such as this one, the government's proof must be more powerful than that. It must be beyond a reasonable doubt.
>
> Reasonable doubt, as the name implies, is a doubt based upon reason—a doubt for which you have a reason based upon the evidence or lack of evidence in the case. If, after careful, honest, and impartial consideration of all the evidence, you cannot say that you are firmly convinced of the defen-dant's guilt then you have a reasonable doubt.
>
> Reasonable doubt is the kind of doubt that would cause a reasonable person, after careful and thoughtful reflection, to hesitate to act in the graver or more important matters in life. However, it is not an imaginary doubt, nor a doubt based on speculation or guesswork; it is a doubt based upon reason. The government is not required to prove guilt beyond all doubt, or to a mathematical or scientific certainty. Its burden is to prove guilt beyond a reasonable doubt.

*Smith*, 709 A.2d at 82. This instruction has been incorporated word-for-word in the "Redbook," Criminal Jury instructions for the District of Columbia, No. 2.108 (5th ed. Rev. 2009).

reach in deciding whether to find him guilty of the various felony offenses with which he was charged.

 Appellant's claim deserves particularly careful scrutiny because it concerns arguments addressed to "the most important" instruction in a criminal trial, the government's burden to prove guilt beyond a reasonable doubt. *Smith,* 709 A.2d at 79–80. Moreover, they were made during rebuttal, depriving the defense of an opportunity to offer a response. *See Clayborne v. United States,* 751 A.2d 956, 970 (D.C.2000); *Hall v. United States,* 540 A.2d 442, 448 (D.C.1988) ("Improper prosecutorial comments are looked upon with special disfavor when they appear in the rebuttal because at that point defense counsel has no opportunity to contest or clarify what the prosecutor has said."). After our independent review of the record we conclude that whether or not the prosecutor's rebuttal comments about the reasonable doubt standard were improper, and whether or not the trial court's response to appellant's objection could have been more forceful, error, if any, was harmless.[4] It is significant that it was the prosecutor, and not the trial court, who made the comments on the reasonable doubt standard that appellant argues were misleading. *See Boyde v. California,* 494 U.S. 370, 384, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (noting that "arguments of counsel generally carry less weight with a jury than do instructions from the court"). In its final charge to the jury, made only

fifteen minutes after the prosecutor's rebuttal, the trial court gave a correct reasonable doubt instruction and also told the jurors that "[m]y function is to . . . instruct you on the law which applies in this case," and that they "must accept" and "not ignore" the court's instructions. The jury was given a copy of the trial court's instructions, including the reasonable doubt instruction, for its use during deliberations, whereas the jury did not have a transcript of the prosecutor's rebuttal argument. Thus, "[t]he impact of [any] misstatement was . . . reduced by the judge's instructions that it was the court's responsibility to apprise the jury as to the law, and that the lawyers' statements were merely argument." *United States v. Venable,* 269 F.3d 1086, 1091–92 (D.C.Cir. 2001).[5] The jury is presumed to follow the court's instructions, *see Taylor v. United States,* 866 A.2d 817, 826 (D.C.2005), and we see no reason not to employ that presumption here, where there is no indication, such as a note from the jury, suggesting that jurors were confused about the evidence or the standard required for conviction.

We also consider the impact of the prosecutor's statements in light of the evidence presented at trial. Appellant claims that trial was a "hard-fought battle," and the reasonable doubt instruction was critical to the defense strategy, given the weakness of the government's case. We cannot agree that the government's case was weak. Appellant was found surrounded by drugs, drug paraphernalia, firearms, and

---

4. Thus, the court does not decide whether the prosecutor's rebuttal was improper in any way, or if so, whether the trial court erred in any way in its response to appellant's objection. Judge Ruiz's separate statement sets out why she believes the prosecutor's rebuttal argument was improper and why elaborations on the meaning of the reasonable doubt standard should be avoided by counsel and, when they occur, promptly corrected by the court.

5. The government also relies on the court's instruction that counsel's "statements and arguments are not evidence." That important instruction serves a different purpose, to direct the jury's attention to the evidence admitted at trial; it does not, however, address the vice appellant challenges in the prosecutor's rebuttal of commenting on the legal definition of the reasonable doubt standard.

ammunition on two separate occasions—one of which involved him smoking marijuana—and both times appellant was, as he claimed when he protested the officers' first search, in "[his] truck, [his] house." Not only Officer Peake, but also Officers Rollins, Phillip, Huxoll, Nickerson and Truby testified about the contraband found during the searches of appellant's home and ice-cream truck. Thus, the evidence provided ample reason for the jury to reject appellant's defense that "it was Kelly Jones and not James Gilliam who possessed with intent to distribute the remaining drugs found on October 13, 2005, and on December 20, 2005, and who possessed the handguns found on both these days." [6]

To conclude, we pay special attention to the prosecutor's comments in rebuttal and especially when they concern the critical reasonable doubt standard. In this case, "[a]fter pondering all that happened, without stripping the [assumed] erroneous action from the whole," we can conclude " 'with fair assurance' " that appellant did not suffer substantial prejudice warranting reversal in light of the trial court's correct instructions overall and the strength of the government's case. *Najafi*, 886 A.2d at 107 (quoting *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239).

### IV. Bail Reform Act Violation

Finally, appellant claims that the evidence was insufficient to establish that he violated the Bail Reform Act, D.C.Code § 23–1327, by failing to appear before the court when his case was recalled on May 31, 2006. The government argues that even though appellant appeared in court when the case was first called that morning, by leaving the court before he was dismissed by a judicial officer, appellant violated D.C.Code § 23–1327. We conclude the evidence was sufficient to support appellant's conviction for violating the Bail Reform Act.

■ To prove a Bail Reform Act violation, the government must prove that the defendant (1) was "released pending trial or sentencing," (2) was ordered to appear in court "on a specified date or at a specified time," (3) and "willfully" failed to appear. *Trice v. United States*, 525 A.2d 176, 179 (D.C.1987) (citing D.C.Code § 23–1327(a)). The statute provides that "[a]ny failure to appear after notice of the appearance date shall be prima facie evidence that such failure to appear is wilful." D.C.Code § 23–1327(b).[7]

Appellant was notified on May 25, 2006, that he had an obligation to return to court on May 31, 2006, for trial. A written Notice to Return to Court stated, in bold print, "**It is your responsibility to appear on time in the proper courtroom. Your obligation is to *remain in the courtroom until released by a Judicial Officer.*"**

6. Appellant's defense was that he possessed small amounts of marijuana for personal use, but had nothing to do with drug distribution or the weapons. He presented evidence that Kelly Jones had previously been arrested after having sold drugs to an undercover officer. In closing, defense counsel argued that appellant had fallen prey to "a couple of young hustlers who moved their drug trade business into the ice-cream truck and then into" the house itself, and that appellant "didn't put a stop to it" because the two young hustlers "kept [appellant] high" by supplying him with drugs for his own use.

7. "Any failure to appear after notice of the appearance date shall be prima facie evidence that such failure to appear is wilful. Whether the person was warned when released of the penalties for failure to appear shall be a factor in determining whether such failure to appear was wilful, but the giving of such warning shall not be a prerequisite to conviction under this section." D.C.Code § 23–1327(b).

(emphasis added). Appellant signed the Notice on May 25, 2006. Appellant and the government stipulated that "on May 31st, 2006, James Gilliam was present before the court for the call of his case. Later that day, when the case was called again, Mr. Gilliam was not present before the court." The trial court then issued a bench warrant for appellant's arrest.

It is undisputed that appellant was actually present before the court for the call of his case earlier in the day of May 31, 2006, and that he was not present later that day when his case was called again. What is in dispute, is whether he appeared "as required" by D.C.Code § 23–1327(a).[8] Although appellant frames his argument on appeal as a challenge to the sufficiency of the evidence, he contends that the indictment[9] and the instruction to the jury,[10] both of which followed the "as required" language of the statute, referred only to the requirement to appear on May 31—which he did—not to the warning in the Notice to remain "until released by a Judicial Officer." Appellant reads the statute too narrowly. What is "required" is determined in the individual case. In appellant's case, it was set out in the Notice to Return that appellant signed on May 25. The Notice specified a date (May 31, 2006) and time (9:30 a.m.), *and* it also stated that appellant had to "remain in the courtroom until released by a Judicial Officer."

When we review a challenge to the sufficiency of the evidence, we must view the

8. "Whoever, having been released under this title prior to the commencement of his sentence, willfully fails to appear before any court or judicial officer as required ..." D.C.Code § 23–1327(a).

9. The indictment reads as follows: "On or about May 31, 2006, within the District of Columbia, James P. Gilliam, having previously been released pursuant to the provisions of Title 23 of the District of Columbia Code in Superior Cases Numbered 2005 FEL 007333 and 2005 FEL 005911, felonies, willfully failed to appear before the Court as required."

10. Appellant does not provide record citation for his contention that "During the review of the jury instructions, Mr. Gilliam's attorney objected to the court's added language for the Bail Reform Act violation that read 'or left before being released by a judicial officer.' The court agreed and deleted the language." Whether or not there was such objection, the instruction delivered to the jury does not include the quoted language. The judge instructed the jury:

And the defendant is charged with a violation of the Bail Reform Act on May 31, 2006. The essential elements of the offense of violation of the Bail Reform Act, each of which the Government must prove beyond a reasonable doubt are: that the defendant was released by a judicial officer in connection with a charge of a felony; two, that on May 31, 2006, the defendant was required to appear before a Court or judicial officer in connection with the charges in this case; three, that the defendant willfully failed to appear as required. Willfully means knowingly, intentionally and deliberately, not inadvertently or accidentally.

If you find beyond a reasonable doubt that the defendant had received notice of the date and place for his appearance before a Court or judicial officer, and that he failed to appear as required, then you may infer that his failure to appear was willful, but you are not required to make this inference. Consider all the evidence in deciding whether his failure to appear was willful. In determining from all the circumstances whether the defendant's failure to appear was willful, beyond a reasonable doubt, you may also consider whether at the time of his release from custody, the defendant was advised by a judicial officer of the penalties for failure to appear. But the Government need not establish that the defendant was advised of the penalties for failure to appear. You may return a verdict of guilty as to the defendant even though there is no *proof that the defendant was advised of the* penalties for failure to appear if you are otherwise satisfied beyond a reasonable doubt from all the evidence that the defendant's failure to appear was willful.

evidence " 'in the light most favorable to the prosecution to determine whether a reasonable factfinder could find guilt beyond a reasonable doubt.' " (*Rodney D.*) *Lewis v. United States,* 996 A.2d 824, 831 (D.C.2010) (quoting (*Timothy L.*) *Lewis v. United States,* 767 A.2d 219, 222 (D.C. 2001)). " '[I]t is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction.' " *In re D.E.,* 991 A.2d 1205, 1211 (D.C.2010) (quoting *Nixon v. United States,* 730 A.2d 145, 148 (D.C. 1999) (alteration in original)). "In assessing the sufficiency of the government's proof, we make no distinction between direct and circumstantial evidence." *Bernard v. United States,* 575 A.2d 1191, 1193 (D.C.1990).

Although direct evidence was available of what happened when the case was first called and what appellant was told when his case was passed over on the morning of May 31, in the form of a transcript of the proceeding,[11] that evidence was not introduced at the BRA trial nor was there any testimony from any person who could testify as to what actually happened in court on May 31. It is difficult to understand why the jury was not presented with the best, most direct evidence that appellant had not been released.[12]

■ Instead, the government introduced the testimony of Michelle McCall, a D.C. Superior Court courtroom clerk, who testified about general courtroom procedures. McCall explained that defendants are told verbally of the penalties for failure to appear, but that it is not courtroom procedure to advise defendants orally that they may not leave until released by a judicial officer. She also said that for the court's computer system, CourtView, to record the issuance of a bench warrant, the courtroom clerk is required to enter a code indicating that the defendant "failed to appear." However, if the defendant appears initially, but fails to remain in the courtroom until released by a judicial officer, the courtroom clerk should manually enter that "[t]he defendant was present, but left the courtroom." The docket entries in appellant's cases, 2005–FEL–7333 and 2005–FEL–5911, note that appellant "failed to appear," but do not show a manual entry indicating that he had initially appeared (as was stipulated) but left without being released. Because the usual courtroom procedures were not followed in this case, McCall's testimony lent scant, if any, support to the government's case that

11. The transcript of the May 31 proceeding appears in the record as an attachment to the government's praecipe submitted in response to the court's order for the government to obtain a copy of the May 31 transcript in the companion case (08–CF–504). The transcript shows that at the May 31 proceeding, Gilliam's counsel asked the court to sever Gilliam's trial from his co-defendants and made reference to a plea offer. (The previous week, counsel had asked for a continuance because he had lost contact with his client). The trial judge denied the severance motion and request for continuance, but allowed counsel a short time to consider the plea offer: "I'm not going to sever the case. He's going to go to trial. Okay, I'll give you thirty minutes. If you don't want to dispose of the case you don't have to. We'll come back. We'll do whatever motions we have to do and then we'll call for a jury panel." The proceedings were passed and continued. The transcript then picks up with the trial court stating, "Mr. Gilliam's case was up earlier this morning. I told him that he wasn't going to get a continuance and I was going to try his case. The co-defendants pled guilty and he has not returned. He was supposed to return in thirty minutes. I've paged him and the court will issue a bench warrant for his arrest."

12. When asked at oral argument, the prosecutor commented, "I believe the transcript was available. There was discussion about introducing it but it wasn't introduced."

appellant had willfully failed to appear as required.

Even so, we conclude there was sufficient circumstantial evidence from which the jury could find beyond a reasonable doubt that appellant had not been released by a judicial officer as required by the Notice, and, thus, failed to appear "as required" when the case was called, in violation of the Bail Reform Act. The Notice to Return to Court, signed by appellant, was introduced into evidence, so the jury was aware of its terms. Pursuant to D.C.Code § 23–1327(b), failure to appear is considered *prima facie* evidence that such failure was "wilful," and the jury was instructed that it could infer wilfulness from the fact of failure to appear as required. In this case, that presumption is validated by Officer Senn's testimony that appellant purposely left the court because he wanted to find witnesses.[13] Moreover, from the fact that the case was, in fact, recalled the same day, the jury could infer that it had been understood, when the case was first called and appellant was in the courtroom, that appellant knew he had not been released and the case would be recalled later in the day. As the jury could find that appellant had been made aware by the Notice to Return to Court that he was required "to remain in the courtroom until released by a Judicial Officer," that he was not present when his case was recalled, and that he had a reason to leave the court, we conclude that the government presented sufficient evidence to sustain appellant's conviction for violating the Bail Reform Act.

For the foregoing reasons, we affirm appellant's convictions.

*Affirmed.*

Concurring statement by Associate Judge, Retired RUIZ at page 25.

Concurring statement by Senior Judge, SCHWELB at page 36.

RUIZ, Associate Judge, Retired, concurring:

The opinion for the court does not address whether the prosecutor's comments on the meaning of reasonable doubt were improper. Although I agree that in this case, the comments were rendered harmless by the trial court's final correct instructions and the strength of the government's case, I write separately to explain why I think the prosecutor's comments in rebuttal were improper, to urge that prosecutors not attempt to restate in their arguments to the jury the carefully calibrated instruction on reasonable doubt the court endorsed in *Smith v. United States,* 709 A.2d 78 (D.C.1998), and to encourage trial judges to take prompt action to correct any statements by counsel that might confuse the jury or divert jurors' attention away from the court's instruction on reasonable doubt.

To begin, it is important to keep in mind the essential difference between closing arguments by counsel and instructions by the court. The purpose of closing argument is to summarize and assist the jury to sift through the evidence presented in the trial just concluded. As we have commented:

> [C]losing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that

---

**13.** United States Secret Service Officer Daniel Senn testified that he had been in the courthouse to testify in appellant's trial and saw appellant walk out of the courtroom next to "a man in a suit." According to Officer Senn, appellant was upset and told the man that he had to go find some witnesses. The officer then saw appellant walk in the direction of the courthouse escalators.

counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt.

The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free. In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment.

*Kearney v. United States,* 708 A.2d 262, 264 (D.C.1998) (quoting *Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975)).

A trial court's instructions, on the other hand, do not comment on the evidence presented at a particular trial, but tell the jury what the law requires. *See Romano v. Oklahoma,* 512 U.S. 1, 23, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (relying on trial court's instruction that "[t]he importance and worth of the evidence is for [the jury] to decide" (first alteration in original) (internal quotation marks omitted)). It then becomes the jury's task to consider and weigh the evidence presented in determining whether it satisfies the law's requirements. The reasonable doubt instruction explains several fundamental constitutional principles that undergird our criminal justice system: the presumption of innocence, the government's burden of proof, and the right to trial. We have described it as

"'perhaps the most important aspect of the closing instruction to the jury in a criminal trial.'" *Smith,* 709 A.2d at 79–80 (D.C.1998) (quoting *Dunn v. Perrin,* 570 F.2d 21, 25 (1st Cir.1978)). "The [reasonable doubt] standard provides concrete substance for the presumption of innocence—that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'" *In re Winship,* 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (quoting *Coffin v. United States,* 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895)). It is "'indispensable, for it impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue[,]' and because it 'command[s] the respect and confidence of the community in applications of the criminal law.'" *United States v. Pinkney,* 551 F.2d 1241, 1244–45 (D.C.Cir.1976) (alterations in original) (quoting *In re Winship,* 397 U.S. at 364, 90 S.Ct. 1068). We stated in *Smith* that "[l]ay jurors should not be left to undertake the important task of deciding whether the government has proven 'the guilt of the accused beyond a reasonable doubt without some intelligent statement of its meaning,'" 709 A.2d at 80 (quoting *Egan v. United States,* 287 F. 958, 967 (D.C.Cir.1923)), and for that reason the court en banc crafted an instruction to promote the use of a comprehensive instruction that would uniformly be given in all criminal trials in the Superior Court. *Id.* at 82. Just as we stated in *Smith* in "the strongest terms," with respect to jury instructions, *id.* at 83, similarly with respect to prosecutorial arguments, the government should "resist the temptation to stray from, or embellish upon, [the reasonable doubt] instruction." *Id.* (quoting *Wills v. State,* 329 Md. 370, 620 A.2d 295, 304 (1993)).

Turning to the prosecutor's comments that are challenged in this appeal, my first

observation is that they do not "help the jury remember and interpret the evidence" presented in the case—the purpose of closing argument. *United States v. Sawyer*, 443 F.2d 712, 713 (D.C.Cir.1971). Rather, they go to the definition of reasonable doubt itself, which is the domain of the trial court's instructions. *See Billeci v. United States*, 184 F.2d 394, 402 (D.C.Cir. 1950) (describing the trial judge's "exclusive functions of conducting the trial and declaring the applicable law"). Even if counsel's comment on the meaning of reasonable doubt might be appropriate in some cases to "emphasize the principles of law that favor their respective positions," *Sawyer*, 443 F.2d at 713, I see two principal risks in the argument made by the prosecutor to the jury in this case: it tended to minimize the critical importance of substantive doubt in the determination of criminal liability, and it unwisely attempted to identify and give examples of the "graver" decisions in jurors' lives that the reasonable doubt instruction mentions only conceptually.

First, the prosecutor commented that in making "any serious decision, you're always still going to have questions. There's one more question you could ask...." But, advised the prosecutor, "it is not reasonable doubt to be able to say I have one more question. Therefore, reasonable doubt, not guilty." The prosecutor's argument contained an internally contradictory message. Even though it referred to the government's burden to "prove guilt beyond a reasonable doubt," it also implied that a juror could convict even if that juror still had a question about the evidence or defendant's guilt. A wholly speculative question or a question about a trivial matter in the case is not the kind of doubt that is considered "reasonable." But a substantial question about a defendant's guilt that is based on the evidence (or lack of evidence) can defeat the cer-

tainty necessary by the constitutional standard to find a defendant guilty "*beyond* a reasonable doubt," even if the government need not dispel every doubt or present proof to "a mathematical or scientific certainty." *Smith*, 709 A.2d at 80 n. 4. A substantive question a juror has at the end of trial—even one—can suffice to make a juror "hesitate" if she is not "firmly convinced," *Smith*, 709 A.2d at 80 n. 6, and prevent her from achieving the " 'subjective state of certitude of the facts in issue,' " *Pinkney*, 551 F.2d at 1243–44 (quoting *In re Winship*, 397 U.S. at 364, 90 S.Ct. 1068), required for conviction "beyond a reasonable doubt." It is the quality of the doubt raised by a question, and not whether it is merely "one more question," that is significant. The prosecutor in this case might not have intended to minimize the importance of lingering, substantive questions, but the choice of words is important. As the Supreme Court has explained, an unreasonable doubt is one that is "fanciful" in the sense that "everything is open to some possible or imaginary doubt," *Victor v. Nebraska*, 511 U.S. 1, 17, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), and the use of certain words can "suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard." *Cage v. Louisiana*, 498 U.S. 39, 41, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (per curiam) (criticizing instruction that told jurors that to be "reasonable," doubt had to be "grave" and "substantial").

A related deficiency in the prosecutor's argument is that it equated a decision to convict with certain personal decisions, such as "getting a job, getting married, moving, any of those things," to the decision of whether or not to convict the defendant of a criminal offense. Although it is tempting to search for important personal decisions, these examples are not necessar-

ily comparable. In any of those examples, a juror might decide to set aside a rational hesitation—a doubt based on reason—because in life many decisions are not based solely on reason or evidentiary facts, but on a combination of reasoning, emotion, intuition, and family and social influences—subjective factors that jurors are not supposed to consider in reaching a verdict. *See Victor,* 511 U.S. at 16, 114 S.Ct. 1239. (criticizing phrase "moral certainty" to describe absence of reasonable doubt but holding its use not unconstitutional where phrase was couched in language that directed jury to consider and compare all the evidence). Moreover, in her personal life, a juror may adjust or correct decisions with the benefit of experience and additional information: relationships adjust or are terminated, jobs and career goals change, people move frequently in a mobile society and economy. It is in the nature of marriage, for example, for there to be change and adjustment. Learning new things about a spouse after marriage is inevitable and perhaps one of the delights of the decision to share life with another. Therefore, having "one more question" a juror could have asked about a prospective spouse does not necessarily call into question the initial decision to marry. What may turn out to have been a "bad" decision to marry is rarely the result of insufficient evidence, but of unrealistic expectations, lack of compatibility, changed circumstances, and unpredictable events. The decision to marry is either confirmed or rebutted by these evolving factors. Not so with a jury verdict. The standard "beyond a reasonable doubt" is supposed to make each juror focus on the evidence presented[1]—not on emotions, hopes, and outside influences—and reflects the finality of a jury verdict.

The verdict of guilt rendered at the conclusion of trial is the final irrevocable act of the jurors based on the fixed set of evidence presented at trial, and, unlike other, personal decisions, is not subject to subsequent correction or adjustment in light of additional information or experience.

Equally important and potentially misleading was the use of examples—"getting a job, getting married, moving"—to describe life situations where a juror might have the "kind of doubt" that is the same as reasonable doubt. Even though the *Smith* instruction refers to the "graver or more important matters in life," 709 A.2d at 82, it does not attempt to describe them. In addition to the important qualitative differences between these decisions and a finding of criminal liability already discussed, the use of specific examples of decisions jurors make in their lives outside the jury room is problematic because what may be "graver or more important" in life is necessarily a subjective judgment. While we may generally assume that for many jurors, "getting a job," "getting married," "get[ting] in a committed relationship," or "moving" may be among the "graver or more important matters in life," this is not necessarily the case for every juror, nor can we even say that they are equally so for the average juror at all times. *See Pinkney,* 551 F.2d at 1244 (finding reversible error when trial judge gave jury hypothetical which compared reasonable doubt to hesitation a young couple might have when deciding to buy a new car, because "the illustration tends to denigrate the graver, more important transactions of life concept" (internal quotation marks omitted)). The reasons for getting married—or committing to a rela-

---

1. "Reasonable doubt, as the name implies, is a doubt based upon reason—a doubt for which you have a reason based upon the evidence or lack of evidence in the case." *Smith,* 709 A.2d at 82.

tionship—may vary from person to person, and from generation to generation, and with such differences, the type and level of tolerated doubt. Similarly, not every job decision or "move" (what kind of "move": apartment? house? city? country?) is necessarily of the utmost gravity, and its importance and consequences will vary widely with a person's circumstances, including age and prospects, at a particular time. Thus, the use of specific examples, that may or may not correspond with the "graver or more important matters in life" of a particular juror at the time of jury deliberations, risks lowering the required standard for conviction or, at a minimum, of confusing jurors depending on how individual jurors view each of the examples given by the prosecutor. *See id.* ("Judicial attempts to clarify the meaning of the phrase 'reasonable doubt' by explanation, elaboration or illustration, as employed here, more often than not tend to confuse or mislead."). For these reasons, the prosecutor's comments could be interpreted as "misdescrib[ing] or lessen[ing] the government's burden of proof." *Smith*, 709 A.2d at 81.

In considering the impact of these kinds of deviations from the standard instruction, it bears keeping in mind that jurors are drawn from a broad cross-section of our heterogeneous community, spanning multiple generations, educational backgrounds, race, ethnicity, gender, and religions, among other traits and circumstances that can influence what is considered a "grave" or "more important" life decision. The instruction approved in *Smith* wisely avoided making use of concrete examples, leaving it to each juror to ponder the evidence, with careful deliberation, in coming to an individual, subjective state of "firm conviction" or "certitude." For these reasons, I would caution the government not to venture into restatements of the reasonable doubt instruction.[2] No matter how well intentioned, it is a practice fraught with peril. *Cf. Smith*, 709 A.2d at 80 ("The Supreme Court has made clear that a constitutionally deficient reasonable doubt instruction is not subject o harmless error analysis and will require reversal.") (citing *Sullivan v. Louisiana*, 508 U.S. 275, 279–80, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)).

**2.** To be clear, prosecutors and defense counsel may in their closing arguments assist the jury in sifting through the evidence presented at trial and commenting on whether that evidence (or lack of evidence) raises a reasonable doubt of the defendant's guilt or suffices to meet the government's burden of proof beyond a reasonable doubt. That was not the focus of the prosecutor's rebuttal here. In this case, defense counsel's closing argument properly focused on questions raised by the evidence presented and the absence of evidence suggesting that the weapons and drugs belonged to the other people found with appellant. Counsel stated that "it's not enough that [appellant] can see Audrey Green and Kelly Jones are dealing marijuana from the ice-cream truck on October 13th; that doesn't make him guilty of their crime ... that doesn't make him guilty just because he can see it's going on" "don't you think that if [appellant] were the owner of those guns, they would be in the safe" where "[appellant] has

got personal checks." See note 6, *ante; see Greer v. United States*, 697 A.2d 1207, 1210 (D.C.1997) (noting that "it is the absence of evidence upon [material] matters that may provide the reasonable doubt that moves a jury to acquit"); *Kyles v. Whitley*, 514 U.S. 419, 446, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (recognizing that defense may properly "discredit the caliber" of the government's case by commenting on the absence of evidence). Defense counsel did not attempt, however, to explain the concept of reasonable doubt or to rephrase the reasonable doubt instruction. In rebuttal, the prosecutor did not directly address the evidentiary deficiencies noted in the defense's closing, but, as described in the text, addressed the meaning of reasonable doubt itself, divorced from the evidence presented in the case. *See Sawyer*, 443 F.2d at 714 ("If counsel's view of the applicable law differs from that of the court, ... there is great danger of confusion.").

The trial court, also, should carefully consider taking immediate corrective action, addressed to the jury, when there is a misstatement of the legal standard "beyond a reasonable doubt" required for criminal conviction. "The question of what, if any, remedial action is appropriate is committed to the trial judge's discretion." *Simmons v. United States,* 940 A.2d 1014, 1024 (D.C.2008). We have said, however, that the trial court should act promptly to correct misstatements to the jury "which touch upon fundamental constitutional principles or call into question the integrity of the verdict," even where there has been no objection. *Allen v. United States,* 495 A.2d 1145, 1152–1153 (D.C.1985) (noting that in cases where there is particular danger of "jury confusion," a sua sponte instruction may be required). This is particularly so for arguments made in rebuttal, which the defense has no further opportunity to counter, and especially so with respect to the most critical instruction, the "constitutional cornerstone of guilt beyond a reasonable doubt," that guides the jury's deliberations and its ultimate verdict.

In this case the trial court chose not to provide an immediate instruction on reasonable doubt or specifically tell the jury to disregard the prosecutor's comments. That choice carries the risk that the jury might assume that the prosecutor's statements had the judge's imprimatur. As discussed in the opinion for the court, in this case the combination of the trial court's instructions and the strength of the government's case against appellant rendered harmless any misstatement in rebuttal argument. But it is better to prevent any potential for jury confusion that comes to the trial court's attention. The jury should be under no misapprehension that it is to be guided as to the law exclusively by the court's instructions. *See Sawyer,* 443 F.2d at 714 (noting that where "there is great danger of confusion . . . the jury

should hear a single statement of the law, from the court and not from counsel").

SCHWELB, Senior Judge, concurring:

In her separate concurring opinion, in discussing the standard "reasonable doubt" instruction adopted by this court in *Smith v. United States,* 709 A.2d 78 (D.C.1998) (en banc), Judge Ruiz "urges" prosecutors not to phrase their arguments in a manner that deviates from that jury instruction, she "cautions" the government not to "venture" into articulations which differ from *Smith*'s, and she "encourages" trial judges to intervene *sua sponte* if a prosecutor uses what she regards as now-inappropriate phraseology. With due respect to my good friend and colleague, I believe that such urging, encouragement, and cautioning "transcend[ ] the judicial function." *Iselin v. United States,* 270 U.S. 245, 250–51, 46 S.Ct. 248, 70 L.Ed. 566 (1926); (Brandeis, J.); *see also Allman v. Snyder,* 888 A.2d 1161, 1169 (D.C.2005) (quoting *Iselin* ). Our job as judges is to decide each case on the basis of the specific record before us, rather than to dispense advice with respect to issues that may arise on different facts in future cases. Indeed, our en banc court has disapproved the practice of providing "unsolicited guidance" regarding what it "behooves" trial judges (and, *a fortiori,* counsel) to do in hypothetical situations not before the court, noting that "an issue is ripe for adjudication only when the parties' rights may be immediately affected by it." *Allen v. United States,* 603 A.2d 1219, 1228–29 & n. 20 (en banc), *cert. denied,* 505 U.S. 1227, 112 S.Ct. 3050, 120 L.Ed.2d 916 (1992) (citations and internal quotation marks omitted). This court has not held, in this case or in any other, that the "reasonable doubt" jury instruction adopted in *Smith* places new restrictions of any kind on what arguments counsel may or may not make on this subject, on how counsel

may or may not phrase these arguments, or on what if any illustrations are now impermissible. I likewise know of no authority suggesting that *Smith* requires intervention by the judge, *sua sponte*, in circumstances in which he or she was not previously obliged to intervene. Moreover, Gilliam did not include in his brief any explicit claim that the *Smith* jury instruction placed new restrictions, not existing under prior law, regarding what counsel may or may not argue, or what if any previously permitted examples of reasonable doubt have suddenly become taboo. The government, for its part, had no occasion to address this specific issue in its own brief. Accordingly, unless and until this court adopts such a restriction clearly and unambiguously relating to the argument of counsel, I cannot agree with what I frankly regard as my colleague's well-intentioned but gratuitous advice to prosecutors and to the trial court. I do not think that we should urge prosecuting counsel not to frame their arguments in a manner which has not been forbidden by this court, nor should we encourage judges to intervene on their own initiative in situations such as the one before us.